THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOSEPH F. BERTOLO, Appellant.

Second Department, June 4, 1984

### APPEARANCES OF COUNSEL

*John F. Middlemiss, Jr. (Karl E. Bonheim* of counsel), for
appellant.

*Patrick Henry, District Attorney (Francis P. Murphy* of
counsel), for respondent.

### OPINION OF THE COURT

O'CONNOR, J.

### PROLOGUE

At about noontime on October 19, 1980, the soft silence
of Beaver Dam Park was suddenly shattered as a young
girl, crying hysterically, ran from the park and on to her
home, a short distance away. In response to her mother's
frantic question, the child, between sobs, described how a
man, whom she did not know, had forcibly held her head
and completed an act of oral sodomy upon her.

Grabbing a baseball bat, the mother ran to the park but
no one was there. "I * * * then ran home and I called the
cops", she later related.

Thus begins the sad saga of the People of the State of New York against Joseph F. Bertolo.

### THE HEARING

On October 28, 1980, Detective Robert J. Matedero, attached to the Third Squad of the Suffolk County Police Department, was working the 5:00 P.M. to 1:00 A.M. tour. Although not assigned to the Bertolo case, he received a telephone call that evening from a Mrs. Fonalledas who lived in the Islip area.

It is now 6:00 P.M.

Mrs. Fonalledas, whom he described as bordering on the hysterical, said she thought that the sodomist was Joseph Bertolo, who she said had previously been involved in an incident with a neighbor's child — named DePaolo — and she demanded to discuss the matter with the detective at once. On cross-examination, the detective said: "[E]verything was dropped because, quite frankly, my boss decided that we should definitely see what this woman had to say and go see her immediately".

Before leaving the squad room, Detective Matedero ascertained from a card index file that Bertolo had previously been arrested on two separate occasions on public lewdness charges relating to the DePaolo child. He did not know whether an information had been filed or if these cases were still pending, nor did he know whether appellant was represented by an attorney.

It is now 6:10 P.M.

Detective Matedero, now with a good lead which demanded prompt investigation, proceeded to the Islip area where he interviewed the 15-year-old DePaolo girl, who told him that Bertolo, who lived nearby, had on previous occasions exposed himself to her nine-year-old sister. Mrs. Fonalledas provided him with rumor and gossip but supplied no concrete tie to the sodomy investigation. She did, however, say that she had seen Bertolo, at different times, behave in a grossly lewd and lascivious manner and that on occasion he had publicly displayed himself in a bizarre and obscene fashion.

Dawn Gianotti, 14 or 15 years of age, who lived across the street from Mrs. Fonalledas, verified the stories of

Bertolo's weird conduct and mentioned that at times he drove a small brown car. Pieces of the mosaic began to fall in place and Detective Matedero decided to visit the Bertolo residence, two blocks away. There, in the driveway, was parked a small brown automobile.

It is now 8:00 P.M.

The detective then drove to the Police Department Central Records Division in Yaphank to get a picture of Bertolo to set up a picture spread, but upon his return neither Jane Doe,[1] the victim, nor Elizabeth Roe, her friend, could identify the appellant although both said that he looked familiar.

The two children and their mothers were then driven slowly past the Bertolo home and the tempo of the investigation sharply accelerated when both girls positively identified the car as the one they had seen that day at Beaver Dam Park.

Following a police consultation, it was decided to interview Joseph Bertolo that very evening.

It is now 11:45 P.M.

When Detective Matedero and his partner, Detective Graniello, went to the Bertolo home, they were greeted by Peter Bertolo, appellant's father, with the remark, "What did Joey do now?" Appellant was advised that the police wanted to talk to him about a crime that took place in the area and he agreed to speak to them.

Then, in the kitchen of his home, with his mother present, appellant was advised of his *Miranda* rights as Matedero read them from a printed police card. Bertolo said he understood his rights and agreed to speak to the detectives at the squad room without a lawyer.

It is now 11:55 P.M.

Leaving their names and telephone number with appellant's parents, the detectives drove the suspect directly to the Third Squad interview room, where the *Miranda* rights were again read from the police card.

Appellant made a full and detailed confession.

---

1. For obvious reasons, the children's names are deleted.

That confession was then put on tape but not until the *Miranda* rights were for the third time read to appellant and his answers to the questions were recorded on the tape itself.

It is now 12:30-12:45 A.M.

Then, using appellant's own language as he talked to Detective Matedero, the confession was typed on paper which had the *Miranda* warnings preprinted at the top of the first page, which appellant read and initialed and to which he inscribed his answer to each inquiry.

Appellant signed both pages of the typed confession which was then witnessed by Detective Graniello and notarized by Detective Matedero. At no time were promises or threats made to appellant nor was appellant handcuffed.

It is now 1:00 A.M.

The confessions gave a detailed description of the precise manner in which appellant committed the crime of sodomy upon Jane Doe.

It is these oral, written and tape-recorded confessions that appellant, by this appeal, seeks to suppress.

Following the confession and with appellant's consent and participation, a five-man lineup was viewed separately by Jane and Elizabeth, but neither child could make a positive identification.

With appellant's approval and cooperation, a voice identification lineup was then arranged. The five participants were told to say, upon command, in their normal speaking voice: "Would you two girls help me find my dog?" That was the precise language used by the man at Beaver Dam Park. Each girl was brought into the room separately and, without hesitation, positively identified Bertolo's voice as the voice of that man.

Because of the physical layout of the lineup room and the viewing room, it was not possible for either the participants or the viewers to see each other during the process.

While statements concerning the voice identification procedures were being taken from Jane and Elizabeth, Jane's mother was put in the lieutenant's office, a room separated from the main squad room, where Bertolo had been brought for processing.

The mother, on her own, wandered out into the squad room and saw there a man handcuffed to a desk. Assuming him to be the molester of her daughter, she shouted, "How could you do this to my baby?" Bertolo blurted out, "I am sorry for what I did to your daughter. I won't do it again. I promise I won't go near the park anymore".

Upon the ground, *inter alia,* that this statement was obtained in violation of his New York constitutional right to counsel, appellant seeks its suppression.

Appellant testified in his defense that during the ride from his home to the precinct the detectives told him that things would go easier for him if he confessed. In substance, he admitted to committing sodomy but only because the detectives promised him he could go home if he confessed; he denied that he received any *Miranda* rights at his home. He conceded that the rights were read to him at the precinct, that he waived those rights, that he agreed to speak to the detectives without an attorney, and that he confessed a half hour after his arrival at the squad room and acknowledged his initials and signature on his written confession. He said that while his confession was being taped, he was asked whether he wanted a lawyer and that he replied, "Yes", but he saw the detective shake his head no; he then said "No". He testified that he changed his answer "[b]ecause I wanted to go home, and he told me that if I said that I did it, you know, I would go home that night". He said he told his father, in the presence of both detectives, that he wanted a lawyer.

Peter Bertolo, the father, then testified that when his son asked for a lawyer in the squad room, he thought to himself, "He's got a lawyer [on his pending charge]". The record at this point is interesting.

"Q So you did not say anything to the detectives about this other lawyer, about this other case?

"A *No, I didn't say nothing about that to him. I was just thinking this to myself* * * *

"THE COURT: What did you say?

"THE WITNESS: 'You have a lawyer'. That's all I said. But I don't know how loud I said it. *Whether he heard it or anybody else heard it.* But I was *thinking* that anyhow" (emphasis added).

In rebuttal, Detective Graniello confirmed the testimony of Detective Matedero concerning the *Miranda* warnings, both at appellant's home and at the precinct. He was present when appellant was asked whether he wanted a lawyer. He said he heard Bertolo say, "Yeah, no, no". He denied that Detective Matedero shook his head and said that Bertolo's response, "no, no" was in response to the question, do you want a lawyer. He said further that when Bertolo met his father in the precinct he did not ask for an attorney.

At this point, the hearing was adjourned at appellant's request so that he could call his mother as a witness on the following day. However, Mrs. Bertolo declined to testify and appellant decided not to call her.

Before the hearing was recessed, the parties stipulated: (1) that on October 28, 1980 there were two misdemeanor charges pending against appellant; and (2) that both cases involved charges of public lewdness and that they were on the Ready Trial Calendar. In both cases, the Suffolk County Legal Aid Society represented appellant commencing on June 9, 1980 on docket number 6289-80, and September 15, 1980 on docket number 8910-80. The first incident was on April 7, 1980; the second was on May 14, 1980.

At the close of the pretrial hearing, the court made specific findings of fact, holding, *inter alia,* that appellant's confessions were voluntarily given, that his constitutional rights were not in any manner violated, and that the voice identification procedures did not violate due process. Appellant's motion to suppress was denied. The court further found that although the police were aware that appellant had been arrested six months earlier on charges of public lewdness, they were not aware that those charges were still pending nor that the appellant had a lawyer on those charges.

### THE TRIAL

The first witness for the People on the trial of the action was the mother of Jane Doe, who testified that on the date of the crime her daughter was 10 years of age. She gave a rather graphic description of the events that took place as

they were recited to her by her young daughter. She was present when the two young girls identified the brown automobile found parked in appellant's driveway, and she was present during the voice identification procedures at the Third Squad. Directing herself to the confrontation she had with appellant at the Third Squad, she estimated on cross-examination that the scene lasted for 5 to 10 minutes. However, it was the testimony of Detective Matedero that when he heard the commotion he separated the mother and Bertolo immediately.

The next witness called by the People was young Jane Doe who at first steadfastly refused to testify or to even talk to the Judge. However, following the luncheon recess Jane indicated that she would be willing to testify if she could write out any answer that she would rather not say orally.

Satisfied as to Jane's qualifications as a witness, the court permitted her to testify under oath but informed the jury that the witness was "going to write out any answers that she finds she can't comfortably give orally". The appellant's objection was overruled.

Jane's testimony essentially was that she and her friend, Elizabeth, were playing in the park on October 19, 1980, when a man whom she had never seen before came by asking them to help find his dog. Elizabeth went in one direction and Jane went into the wooded section. Her written version of what followed was read to the jury by the court reporter. It was, in substance, that the man had something pointed in his pocket which she thought was a knife, and that he forced his penis into her mouth and ejaculated.

Jane had positively identified, without hesitation, voice number three at the voice identification lineup as the man in the park. Voice number three was the appellant.

Elizabeth Roe, age 11, testified that she went with Jane to Beaver Dam Park on the day in question and that a man came by and asked them to help him look for his dog. She said that she went in one direction while Jane went with the man towards the forest across the street. Some 15 minutes later, Elizabeth, riding on her bicycle, was within four feet of the man as he drove past her in his small brown

car and she saw the silver letters across the door and along the bottom. She identified the dome-shaped hubcaps which were flattened by the emblem of the company. She positively identified the car and the appellant.

She testified that as she went back to the park, Jane came out of the woods crying hysterically. They ran directly to Jane's home and she heard her young friend tell her mother of the assault.

It was her testimony that when the voice lineup was conducted she positively identified the man in the park and said that the man was the appellant, Joseph Bertolo.

Ira Dubey, the chief forensic serologist for the Suffolk County Crime Laboratory, testified that the stain on Jane's jacket contained human seminal fluid with intact spermatazoa.

We must here backtrack to October 19, 1980, the day of the crime. It was Police Officer Roger Elderbaum who first received the radio call at 12:50 P.M. and rushed to Jane's home.

Elderbaum requested Detective Louis Rubsam to respond to the scene. Rubsam, a 12-year veteran of the force, brought the young girls and their mothers to the precinct. At the suggestion of the children who had described the suspect's car as a brown compact, Rubsam drove down Islip Avenue with the girls to the Bertolo home. The only vehicles found there were a gold Volkswagen in the garage and a white van in the driveway. The children said that the gold car was not the vehicle in question.

Later, Detective Rubsam and Police Officer Ahl returned to the Bertolo residence, gave the *Miranda* rights to Joseph Bertolo and talked to him briefly. Appellant said that he had been home all that morning, and that he had not gone out at all. Rubsam further testified that the perpetrator's description as given by the girls was too skimpy to tie Bertolo to the crime, whereupon Rubsam left and "proceeded to pursue the investigation further".

For the next 10 days, the investigation apparently just sputtered on and the record is devoid of any progress until Detective Matedero received the Fonalledas telephone call on October 28.

Detective Matedero, who entered the investigation on the evening of that day, repeated most — if not all — of his hearing testimony at the trial. He again said that when he took Jane and Elizabeth on a random search of the neighborhood they came upon a brown compact car parked in the Bertolo driveway, that Matedero had observed earlier. The girls positively identified the car as the one driven by Jane's assailant. The car was owned by appellant's sister.

Detective Matedero testified that the *Miranda* warnings were given to appellant for the first time in the kitchen of the Bertolo home in the presence of Bertolo's mother and again in the interview room at the Third Squad. Joseph Bertolo confessed to sodomizing Jane Doe in Beaver Dam Park on October 19, 1980. That confession was recorded on tape, and transcribed in written form and the tape was played for the jury. A signed and written confession which contained the *Miranda* warnings was read to the jury.

The detective related in some detail the proceedings connected with the voice identification lineup and testified that both girls quickly and positively identified the voice of appellant.

It is interesting to note at this point that in addressing himself to the *Rogers* issue (see *People v Rogers,* 48 NY2d 167), the essence of this appeal, Detective Matedero testified at the hearing that his team, himself and Detective Graniello, were not on duty on October 19, 1980 — the day of the crime — and that until October 30, he was totally unaware of the visit of Rubsam and Ahl to the Bertolo home on October 19. He did not enter the case until October 28, at 6:00 P.M., when he received the phone call from Mrs. Fonalledas. Following her call, he looked at the index card file and found the names Bertolo and DePaolo. He went to the arrest book which contained two separate arrest entries for Bertolo for public lewdness and a complaint number which would enable one to go to the case jacket. He said: "*Subsequent* to my entire investigation of the Bertolo matter, I ascertained that they [the case jackets] were in fact there [in the Third Squad]". He did not, at that moment, attempt to find or locate them because of the exigent circumstances of that night. He said, "Sir, at the time I was acting under exigent circumstances, and I was

full steam ahead from 6 P.M. that evening until the completion of my tour".

When asked if he knew on October 28 that there were two misdemeanor informations and/or complaints concerning the Bertolo arrests, Matedero said he did not. As a matter of fact, it was Matedero's testimony that the first time he saw the misdemeanor complaints was when the Assistant District Attorney trying the case requested them.

The defense called appellant's mother and father, his sister, his sister's close friend, and his 14-year-old niece, in an effort to establish that appellant was home in bed on Sunday morning, October 19, 1980, when the crime was committed, and that his sister, who owned the brown car, had used it that morning to drive to church with appellant's mother, her daughter and a friend. In the main, this alibi testimony was weak, shaky and filled with contradictions, was largely rebutted by the prosecution and was obviously rejected by the jury.

The jury returned a verdict of guilty on both counts[G] and from that judgment this appeal is taken.

### THE ISSUE

The essence of this appeal, and the prime issue upon which it rests, is whether or not Criminal Term should have suppressed the oral, tape-recorded and written confessions of appellant.

The People strongly suggest (1) that suppression is not mandated because at the time appellant confessed he was not in custody and hence police interrogation was entirely proper, and (2) that the so-called rule of *Rogers-Bartolomeo* (see *People v Rogers*, 48 NY2d 167, *supra; People v Bartolomeo*, 53 NY2d 225), under the facts and circumstances here extant, does not apply.

The defense contends to the contrary, (1) that appellant was in fact in custody[2] and (2) because the police knew of his two prior pending arrests, the *Rogers-Bartolomeo* rule applies and suppression is mandated.

---

**2.** The custody issue was not mentioned in appellant's motion papers to suppress. It was only during the hearing that, for the first time, appellant claimed he was in custody when he confessed that he had committed the crime.

THE LAW

It has long since been settled that until a suspect is in police custody, or until a critical stage of the proceedings has been reached, he may properly be interrogated without being advised of his constitutional rights (see *People v Rowell,* 59 NY2d 727). In *Rowell* (*supra*), defendant's inculpatory statements were made during a voluntary polygraph examination yet defendant contended that his Fifth Amendment rights had been violated under the rule of *Miranda v Arizona* (384 US 436). The trial court and this court sustained that contention but the Court of Appeals reversed, reinstated the judgment and, in substance, ruled that, because the defendant was not in custody, the police were free to question him if he chose to talk to them and that statements thus obtained were admissible in evidence.

It should be here noted that if a suspect is not in custody, the *Rogers-Bartolomeo* rule is inapplicable (*People v Torres,* 97 AD2d 802).

It is the People's contention that Bertolo voluntarily accompanied the police to the Third Squad room for questioning and a lineup. Support for that position may be found in Criminal Term's decision, findings of fact and conclusions of law. *Inter alia,* in its decision, the court indicated that it had carefully evaluated the testimony and the credibility of each of the witnesses who appeared at the hearing and found that the testimony given by Detectives Robert Matedero and Dan Graniello to be generally consistent, forthright and credible. On the contrary, it found the testimony of the appellant and his father "not to be credible when tested by the customary credibility standards". Again, *inter alia,* in its findings the court determined that the *Miranda* rights had been given to appellant on three different occasions and appellant had agreed to talk to the detectives without counsel and to go to the Third Squad room for a lineup.

In *People v Leonti* (18 NY2d 384, 390), the court said: "[W]here there are conflicting inferences to be drawn from the proof, the choice of inferences is for the trier of the facts. And that choice is to be honored unless unsupported, as a matter of law". That view was confirmed by the Court

of Appeals in *People v Yukl* (25 NY2d 585, 588) where the court said: "Our review is limited to the question of whether there was sufficient evidence to support the hearing court's finding. (*People* v. *Boone,* 22 N Y 2d 476.)"

The People's position is supported, to a minor degree, by statements made on the record by appellant, his attorney and the prosecuting attorney:

"MR. NEILON [defense counsel]: He was under the impression * * * that he was only accompanying the police; that he was not under arrest * * *

"A [BERTOLO]: I was told that they just wanted me to come down for a lineup. That I wasn't under arrest * * *

"MISS SCLAFANI [the prosecutrix]: Now, Mr. Bertolo, at your house you were told that you were not under arrest. Is that right?

"A Yes".

It must be conceded that the impact of these statements is, however, miniscule because it is basic that custody is not determined by the subjective reflections of the suspect, nor by what the District Attorney or the police say or think. Rather, it is the conclusion of "a reasonable man" — would he think he was being deprived of his freedom of action in a significant way? (*Matter of Kwok T.,* 43 NY2d 213, 219; *People v Rodney P.,* 21 NY2d 1, 9.) But what *facts* were known by appellant at the time of his confession? He knew nothing of the extent or the results of the police investigation. For instance, he was not told that Detective Matedero had determined, from conversations with the DePaolo family, that Bertolo matched the description of the suspect. Nor did appellant know that earlier that evening the People's two prime witnesses had seen his automobile parked in the driveway of his home and that they both positively identified it as the car driven by the perpetrator at the time the crime was committed. All he knew was that the police wished to talk to him about a crime that took place in the area and that they wanted to conduct a lineup at the precinct. At this point, Bertolo agreed to speak to the police without a lawyer and he voluntarily accompanied them to the Third Squad.

It is worthy to note that although the People's witnesses identified the Bertolo car, they were unable to identify Bertolo from a picture array shown to them at the same time. From the totality of these facts, it is dubious whether the police had probable cause to arrest appellant as they accompanied him to the squad. Our "reasonable man" then would be hard pressed indeed, under these circumstances, and up to this point, to conclude that he had been deprived of his freedom of action to any significant degree. We, therefore, sustain the People's contention that at the time appellant orally confessed his crime, he was not under arrest and was not in custody. It is clear that at this point it was not required that he be given his *Miranda* rights, although they had already been given to him twice (see *People v Waymer,* 53 NY2d 1053).

But what of the tape-recorded and written confessions? Here the sequence of events is interesting. Upon completion of the oral admissions, that confession was tape recorded and the typed confession was initialed and signed by appellant. The three confessions are identical in substance and they were taken in a continuing and uninterrupted sequence.

A somewhat analogous situation, at least on the narrow issue involving the suppression of oral and written confessions taken under similar circumstances, was presented in *People v Garofolo* (46 NY2d 592). There the Court of Appeals suppressed a defendant's written confession because of a clear abuse of defendant's right to counsel but sustained the trial court's denial of suppression of his oral confession on a finding that defendant's attorney did not enter the proceedings until after the oral confession was complete.

It was the People's contention that because Garofolo's untainted oral confession was, in all material respects, identical to the written one, neither one should be suppressed. The Court of Appeals, however, rejected that argument on the theory that the written confession was undoubtedly accorded more weight by the jury than the oral one. In ordering suppression, the court stated: "Thus, by reiterating and, hence, corroborating the substance of the oral confession, the written statement may well have

erased whatever doubts the jury entertained concerning the credibility of the witnesses upon whom the People had to rely to prove the contents of the unwritten one" (*People v Garofolo, supra,* p 602).

Returning now to the facts before us, upon completion of the confessions, the police indubitably had probable cause to arrest appellant but no arrest was made at that point. Immediately, the voice identification lineup was arranged and when the same two witnesses positively identified Bertolo's voice as that of the perpetrator, then, and only then, was appellant arrested, taken into custody and hand-cuffed.

However, following the cold logic and the clear thrust of *Garofolo* (*supra*), it is concluded that appellant was in custody at the conclusion of the oral confession. At that point, it is beyond cavil that Bertolo was totally deprived of his freedom of action. He would not, under any circumstances, have been permitted to leave the squad room.

In his testimony, appellant stated that the oral confession was taken a half hour after his arrival at the precinct. It should be here noted that the entire record is totally devoid of any suggestion of threats or intimidation or of physical restraints by police or anyone else, nor is it at any time inferred or indicated that appellant was in custody or under arrest (*People v Johnson,* 91 AD2d 327, 330). It is entirely possible, even probable, that, subjectively, appellant was scared and even thought he was in custody, but that is not enough. As the court in *People v Yukl* (*supra,* pp 591-592) said: "The testimony on the record supports the conclusion that Yukl voluntarily came down to the police station, voluntarily answered the questions and voluntarily gave up the various articles of clothing. It may not be said, as a matter of law, that prior to receiving the warnings, a man in Yukl's position would have felt that he was in custody. Although it may be possible that Yukl felt obligated to co-operate with the police in order to maintain his facade of innocence, this subjective view by the defendant does not require that we find him to have been in custody".

It is equally clear that appellant, with seven arrests including at least one felony conviction, was an experi-

enced criminal, totally capable of deciding if and when and whether he needed counsel. Three times during the *Miranda* procedures and in response to three separate inquiries, he flatly stated that he did not want counsel and to top it off, he did not once mention that he had an attorney on the pending public lewdness charges. It is seriously and strongly suggested that such a consistent course of conduct is a functional equivalent to the denials found in *People v Lucarano* (61 NY2d 138). Lucarano merely denied that he had a lawyer. Bertolo not only, in effect, denied that he had a lawyer, but made it clear that he did not want one.

In any event, the record is crystal clear that appellant was read the *Miranda* rights on three separate occasions, that he fully understood them and that he intelligently and knowingly waived those rights not once but thrice.

However, and alternately, appellant claims that all three confessions demand suppression under the terms of the so-called *Rogers-Bartolomeo* rule. The concluding portion of this already too long opinion will explore that theory in some depth. In doing so, we wish to make it clear that it is neither our intention nor our goal to fashion a fixed, per se rule to be applied to every case that falls within the shadow of *Rogers-Bartolomeo*. Our discussion and the conclusions we reach are severely proscribed by the facts and circumstances presented in the case before us.

### ROGERS-BARTOLOMEO

Appellant's theory is predicated entirely upon the so-called *Rogers* rule as enunciated in *People v Rogers* (48 NY2d 167, *supra*) and expanding progeny. The *Rogers-Bartolomeo* rule, as extended, states in substance that if a suspect is represented by an attorney in a pending case involving a serious charge, the police, who know of the pending charge, or *should know* about the legal representation, may not elicit from him any statement. Good faith is demanded of the police who may not overlook the obvious at the risk of being charged with constructive notice (*People v Bartolomeo*, 53 NY2d 225, *supra*).

In *Rogers* (*supra*) the facts were truly egregious. The defendant, a youth of limited education, was a robbery suspect who told the police that he had an attorney and, in

fact, that attorney called a short time after the interrogation began and instructed the police to cease questioning. Despite this admonition, interrogation on activities not related to the robbery went on for better than four hours during which time the defendant, while manacled to precinct furniture, volunteered an inculpatory statement. Holding that in this atmosphere of coercive influence, defendant's inculpatory statement was not " 'spontaneously volunteered' " (*People v Rogers, supra,* p 174, quoting from *People v Hobson,* 39 NY2d 479, 483) the court ordered suppression.

In *Bartolomeo* (*supra*), too, the facts were disturbing in that the police who interrogated defendant on a murder charge *knew* that he had been arrested and arraigned on a felony arson charge only nine days before. Even though the police did *not* know that defendant had a lawyer in the arson case, the court reasoned that the police with *actual* knowledge of the felony charge which, obviously, was still pending, were under an obligation to inquire whether the defendant was represented by an attorney. In short, the police were charged with *constructive* knowledge and suppression was decreed.

### BARTOLOMEO-SMITH-SERVIDIO

That the severity of the pending charge is an important, if not compelling, factor is clearly indicated by the Court of Appeals in *People v Smith* (54 NY2d 954) and *People v Servidio* (54 NY2d 951).

In *Smith* (*supra,* p 956) as in *Bartolomeo* (*supra*), the pending unrelated charge was a felony — sodomy — and the arresting officer testified that he "assumed that defendant had an attorney on that charge". In both cases, the police had actual notice of the pending charge but in neither did they *know* that the defendant had counsel.

In *Bartolomeo* (*supra*), the pending felony — arson — was but nine days old; in *Smith* (*supra*), it was eight months old. Both cases make it clear that if the police know that the pending charge is a felony, the gravity of such a charge — almost standing alone — is sufficient to trigger *an* immediate inquiry as to whether or not the defendant is represented by counsel. If he is, all interrogation must cease forthwith.

Failure by the police to act in good faith and to properly discharge that responsibility results in prompt judicial suppression (*People v Bartolomeo, supra,* p 232; see, also, *People v Ramos,* 40 NY2d 610, 617).

But it is not with such reflections that we are here concerned because at bar the pending charge is not a felony but at best a low-grade misdemeanor. Logic indicates that as *Smith* (*supra*) parallels and follows *Bartolomeo* (*supra*) so *Bertolo* parallels and should follow *Servidio* (*supra*). In *Servidio* (*supra,* p 953) the pending charges (unauthorized use of a motor vehicle and resisting arrest) were class A misdemeanors and the language of the Court of Appeals in denying suppression is clear and compelling: "Nor in view of the minor nature of the charge (unauthorized use of a motor vehicle and resisting arrest) can it be said that the police deliberately overlooked the obvious or insulated the interrogating officers from actual knowledge of the pending unrelated charges, even though they were pending within the same county and presumably the same department, and were but two and one-half months old (cf. *People v Kazmarick,* 52 NY2d 323; see *People v Bartolomeo,* 53 NY2d 225)" (see, also, *People v Lucarano,* 61 NY2d 138, *supra*).

At bar, although Detective Matedero knew of the two Bertolo arrests, he did *not* know whether an information/complaint had been filed and so, of course, he could not and did not know that the charges were then pending and he did *not* know that appellant had legal representation. To order suppression predicated upon two arrests on public lewdness — charges which customarily are quickly disposed of as violations — would, in my opinion, not only be violative of the clear intent of *Servidio* (*supra*) but would do violence to a traditional and still highly valued American trait, old-fashioned common sense.

So as we struggle to once again draw that thin hard line between individual rights and State responsibilities, we are beset by the prophetic words of Judge Wachtler joined in dissent by Judge Jasen and Judge Gabrielli in *Bartolomeo* (*supra,* p 239): "It is the common criminal, not the one-time offender, who nearly always will manage to have at least one serious charge pending, so that the attorney in

the picture can provide him with virtual immunity from questioning in subsequent investigations".

In the light of that language, it is instructive to look into the appellant's background.

Joseph Bertolo, born September 7, 1957, was at an early age initiated into the procedures and practices pursued by police in the processing of persons suspected of criminal conduct.

His record follows:

| | | |
|---|---|---|
| May, 1974 | - | Burglary third degree. Plea attempted criminal trespass. |
| March, 1978 | - | Robbery first degree. Plea attempted burglary third degree. |
| June, 1978 | - | Sexual abuse third degree. Dismissed. |
| May, 1979 | - | Public lewdness. Dismissed. |
| July, 1979 | - | Sexual abuse third degree. Conditional Discharge. |
| April, 1980 | - | Public lewdness. Pending. |
| May, 1980 | - | Public lewdness. Pending. |

Far from being a neophyte first offender, Bertolo is an experienced, streetwise, second felony offender who learned early and well all about *Miranda* and its rights. He knew that he was not under arrest, that he did not have to answer Matedero's questions and that he did not have to make any statements concerning the events at Beaver Dam Park. He was not handcuffed, and he was fully and repeatedly advised of all his civil rights and had free access to his father and mother at home and to his father at the squad (cf. *People v Fuschino,* 59 NY2d 91; *People v Bevilacqua,* 45 NY2d 508). His confession was voluntary and complete and was evoked by neither promise nor inducement. To borrow again from *Servidio* (*supra,* p 953), in view of the minor nature of the charges and even though "they were pending within the same county and presumably the same department", his confessions should not be suppressed (see *People v Bartolomeo, supra; People v Kazmarick,* 52 NY2d 322).

Finally, appellant seeks to suppress the admission made to the mother of the victim. He alleges that his statement was not a spontaneous outburst but was the result of intensive, coercive police presence augmented and intensified by his prior confessions which the police obtained in direct violation of his right to counsel. The record indicates that the statement was not made to the police but to a layman and it appears to have all the earmarks of a spontaneous and excited utterance. Moreover, the following colloquy between the Trial Judge and defense counsel is revealing:

"THE COURT: You haven't moved to suppress this conversation in the squad room.

"MR. NEILON: That's correct.

"THE COURT: So it has nothing to do with this hearing".

Thus, in any event, appellant clearly waived any objection to the introduction of such evidence and therefore the error, if any, has not been preserved for appeal.

We have considered appellant's remaining contentions and find them to be without merit.

### EPILOGUE

The judgment appealed from should be affirmed.

NIEHOFF, J. (concurring). As Justice O'Connor has so ably demonstrated in his opinion for affirmance, as the result of dogged and dedicated police work by Detective Robert J. Matedero of the Suffolk County police force, defendant, Joseph Bertolo, was identified as the man who had forced 10-year-old Jane Doe to perform an act of oral sodomy upon him, and was apprehended. Thereafter, the police scrupulously followed the dictates of *Miranda v Arizona* (384 US 436), advising him, prior to any questioning, that he had the right to remain silent, that anything he would say could be used against him in a court of law, that he had the right to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him prior to any questioning if he so desired. Indeed, he was so informed on three occasions. After knowingly waiving his right to counsel on each of those three occasions, defendant gave oral, tape-recorded and written confessions.

In holding that defendant's application to have those confessions suppressed was properly denied, Justice O'Connor has concluded that (1) defendant was not in custody when he gave the first, or oral confession and, therefore, the right to counsel did not attach prior to the time that such confession was made, and that the tape-recorded and written confessions made thereafter were also admissible inasmuch as defendant's consistent course of conduct is a functional equivalent to the denials found in *People v Lucarano* (61 NY2d 138) thereby obviating any need for the police to inquire as to whether defendant had counsel on prior unrelated charges, and (2) in any event, the *Bartolomeo* (*People v Bartolomeo*, 53 NY2d 225) rule is inapplicable to the facts of this case.

Although I agree with Justice O'Connor that the oral confession was properly denied suppression because defendant was not in custody when it was given, I cannot agree that the subsequent tape-recorded and written confessions are admissible on the ground that defendant's consistent course of conduct is a functional equivalent to the denials found in *People v Lucarano* (*supra*). In my view, if the principle announced in *People v Bartolomeo* (*supra*) applies to the facts of this case, the tape-recorded and written confessions must be suppressed.

That brings me to that which I perceive to be the principal issue which this court must resolve, namely, whether the tape-recorded and written confessions should have been suppressed because at the time of the questioning, the detectives who cracked the case (1) knew that Bertolo had been arrested approximately six months previously on two different public lewdness complaints and (2) failed to ask Bertolo if those complaints resulted in formal criminal charges and, if so, whether those charges were still pending and, if so, whether he had counsel representing him on such prior charges.

Based upon the facts in this case, I am of the view that Detective Matedero was not obligated to ask defendant the foregoing questions, and that defendant's right to counsel was not violated by the failure of Detective Matedero to ask defendant such questions. I agree with Justice O'Connor that the statements were properly admitted into evi-

dence, and that there should be an affirmance of the judgment of conviction. However, my reasons for arriving at that conclusion differ somewhat from those of my esteemed colleague. Hence, I believe it appropriate to explain the manner in which I have arrived at my conclusion.

Following the lengthy pretrial hearing in this matter, the hearing Judge rendered a detailed decision in which he found, *inter alia,* that although Detective Matedero had actual knowledge of the fact that Bertolo had been arrested in connection with exposure incidents on April 7 and May 14, 1980, the detective was not aware of the status of those complaints at the time he questioned the defendant on October 29, 1980 as to the instant crime. It should also be noted that the detective specifically testified that he did not know whether informations had ever been filed in connection with such complaints.

There is no doubt that the hearing court's findings were supported by evidence contained in the record and there is no sound reason to disturb those findings on appeal. Consequently, we have before us a situation where the investigating officer questioned a suspect knowing only that approximately six months earlier the suspect had been arrested on two separate occasions on public lewdness complaints.

Was that knowledge, standing alone, sufficient to have imposed upon Detective Matedero a constitutional duty to make inquiry as to whether formal criminal charges resulted from those prior arrests and, if so, whether those charges were still pending and, if so, whether defendant was represented by an attorney in connection with those prior charges? My answer to that question is "no". I so conclude notwithstanding the fact that if Detective Matedero had asked those questions of defendant, and if defendant had been truthful in answering them (which, as we have learned, is not always the case with a defendant confronted with information concerning prior charges [see *People v Lucarano, supra*]), he would have learned that there were open public lewdness charges against defendant on which he was represented by counsel.

In *People v Lucarano* (*supra,* pp 145-146), Judge Wachtler, writing for a unanimous Court of Appeals, has summarized the pertinent law as follows:

"In recent years, this court's efforts to delimit the proper bounds of police questioning of a suspect in custody has led to the development of several lines of cases dealing with an individual's right to counsel. We began with the rule that once an attorney has entered a criminal proceeding for the purpose of representing a suspect in custody on the charges under investigation, further questioning is precluded in the attorney's absence (*People v Donovan,* 13 NY2d 148; *People v Arthur,* 22 NY2d 325; *People v Hobson,* 39 NY2d 479). Nor can this right to the assistance of counsel be waived by the suspect unless his attorney is present. Thereafter, we expanded the circumstances under which the right is deemed to attach, holding that once the police have knowledge that defendant is represented by counsel on an unrelated pending charge, no uncounseled waiver of the attorney's assistance will be effective (*People v Rogers,* 48 NY2d 167). But the mere fact that there are outstanding charges as to which defendant's right to counsel has attached will not preclude questioning on a new charge, unless the police know or have reason to know that defendant is actually represented on the outstanding charges (*People v Fuschino,* 59 NY2d 91). The emphasis in this line of cases has been upon knowledge on the part of the police of the event triggering the right to counsel. Thus, where the police know defendant is represented by counsel in connection with the charges under investigation (e.g., *People v Hobson, supra; People v Paulin,* 25 NY2d 445; *People v Ramos,* 40 NY2d 610; *People v Singer,* 44 NY2d 241), or that defendant is represented by counsel on an unrelated pending charge (e.g., *People v Rogers, supra; People v Miller,* 54 NY2d 616) or where defendant has indicated that he desires the assistance of counsel (*People v Cunningham,* 49 NY2d 203), we have demanded that the police strictly respect the defendant's right to have that attorney present during questioning. With few exceptions, the knowledge on the part of the police of the event triggering the right to counsel was actual knowledge, and thus the police were required to afford defendant a right they knew had come into existence.

"Not until our decision in *People v Bartolomeo* (53 NY2d 225, *supra*) did we impose an affirmative obligation on the

police to ascertain whether a defendant had obtained representation on a pending charge. There, we held that where the police had actual knowledge of a recent arrest, an outstanding arson charge against defendant, they had an obligation to make inquiry as to whether defendant was represented by an attorney in connection with that charge. Failing such an inquiry, the police were chargeable with whatever information the inquiry would have disclosed".

As can be seen from the recitation of facts above, this is not a case where the police were possessed of *actual knowledge* that (1) the defendant was represented by counsel in connection with the charges under investigation (e.g., *People v Hobson,* 39 NY2d 479), or (2) the defendant's right to counsel had attached on any prior unrelated charges (e.g., *People v Rogers,* 48 NY2d 167), or (3) that the defendant had prior unrelated charges still pending against him (e.g., *People v Bartolomeo,* 53 NY2d 225, *supra*). If this case fell within any of the above delineated fact patterns, our inquiry would come to an end for the reason that the Court of Appeals has told us that in situations (1) and (2) above, all questioning must cease in the absence of counsel and in situation (3) the police would have "an obligation to make inquiry as to whether defendant was represented by an attorney" and "[f]ailing such an inquiry, the police [would be] chargeable with whatever information the inquiry would have disclosed" (*People v Lucarano, supra,* p 146).

Rather, the case before us involves a situation where the affirmative duty of inquiry, if it is held to attach, is premised solely upon an investigating officer's knowledge of two public lewdness arrests made approximately six months before the present crime was committed.

In *People v Lucarano* (*supra,* p 146), the Court of Appeals characterized the rule in *People v Bartolomeo* (*supra*) as imposing an affirmative obligation on the police to ascertain whether a defendant had obtained representation on a prior charge, "where the police had actual knowledge of a *recent* arrest, an outstanding arson charge" (emphasis added). Thus, actual knowledge of a prior charge, in and of itself, is not enough to trigger the duty to inquire. There must be actual knowledge of a "recent" arrest.

Manifestly, the Court of Appeals was careful in its choice of words because it did not intend to impose upon the police an obligation to make inquiry simply because the defendant had a prior involvement with the criminal justice system. If the defendant's prior involvement is "recent" there is good cause to believe that a charge may still be pending and that the suspect may be represented by counsel on the unrelated charge and, so, inquiry must be made. Otherwise, no inquiry is mandated. Moreover, in imposing an obligation of inquiry upon an investigating officer possessed with knowledge of a "recent" arrest, the Court of Appeals purposely did not set a rigid timetable by which to determine what constitutes a "recent" arrest. That is, no specific period of time is enunciated in the cases. As I read the court's decisions, the determination of whether a suspect's prior involvement with the law entitles him to protection under the *Bartolomeo* (*supra*) holding is to be made on a case-by-case basis. Indeed, in another context, the word "recent" has been described by our courts as "a relative term dependent on the surrounding circumstances * * * and not susceptible of precise definition" (*People v Friedman,* 149 App Div 873, 876) and as a word which "has a relative, not an absolute meaning" (*People v Singer,* 300 NY 120, 124). Doubtless, certain prior arrests may, as a matter of law, be labeled as "recent" and other such arrests may, as a matter of law, be classified otherwise. But, it seems to me that there will be prior arrests which will not be so easily categorized. In those instances, the issue of whether the prior arrest is recent may well have to be decided as one of fact, or of mixed fact and law. In my judgment, this case must be decided in that fashion.

Turning now to the pertinent Court of Appeals decisions we find that the court (1) has held in *People v Bartolomeo* (*supra,* p 229) that knowledge of the interrogating officer that "a suspect being questioned had been arrested by the same law enforcement agency nine days previously" for arson required the investigating officer to make inquiry as to said charge; (2) has held in *People v Smith* (54 NY2d 954, 955-956), that knowledge of the interrogating officer that "defendant had been arrested eight months earlier on a sodomy charge by the same police department" likewise

obligated the officer to make inquiry concerning the earlier charge; and (3) has held in *People v Fuschino* (59 NY2d 91, 98), that no such inquiry was required where the interrogating officer who had personally arrested the defendant about 14 months prior to the questioning testified that he believed (a "reasonable and well-founded belief") those charges to have been dismissed (which they were) and testified further that he was unaware of a 25-day-old arrest on unrelated charges made by a different police department.

An examination of the foregoing cases discloses that the Court of Appeals has not yet ruled on a case such as this one where the police did not have knowledge of whether formal charges had emanated from an earlier arrest and where the arrest was for a minor offense committed approximately six months before the present crime which is under investigation.

In a word, the case at bar falls somewhere in between the fact patterns set forth in the above Court of Appeals cases.

As noted earlier, Detective Matedero knew only that Bertolo had been arrested for public lewdness in April and May of 1980. Public lewdness is a class B misdemeanor (Penal Law, § 245.00), the most minor classification of misdemeanors, for which the People must be ready for trial within 60 days of the commencement of the action (CPL 30.30, subd 1, par [c]). So, even if we assume, *arguendo,* that (1) Detective Matedero knew that Bertolo's earlier arrests had culminated in formal criminal proceedings (which, as pointed out, above, is clearly not the case herein), or (2) that it was not relevant whether or not he knew that formal charges followed the arrests, it was not unreasonable for the detective to have assumed that such minor charges (which, as Justice O'Connor points out, are usually disposed of as violations) would have been terminated sometime prior to October 28, 1980. Inasmuch as the assumption was a reasonable one for the detective to have made, I find it difficult to see how he can be faulted for having failed to make inquiry concerning the arrests on the unrelated charges or how his conduct can be said to have resulted in depriving defendant of his right to counsel. In sum, I do not believe that under the facts and

circumstances of this case, it can be said, either as a matter of law or fact, that Detective Matedero had knowledge of any "recent" arrests of defendant for purposes of the *Bartolomeo* rule. If that be so, he was under no duty to make an inquiry of the defendant concerning the public lewdness charges. Nor is there any basis in the record to lead us to conclude that Detective Matedero acted in bad faith in not questioning Bertolo concerning the prior public lewdness charges. There is not a scintilla of evidence in the record to support the conclusion that Detective Matedero acted with malice aforethought when he did not inquire about the public lewdness arrests or that his conduct discloses that he deliberately undertook to insulate himself from the knowledge that Bertolo was represented on public lewdness charges. In this connection it should not be overlooked that at the time Detective Matedero questioned the defendant, the Court of Appeals had not, as yet, decided *People v Bartolomeo (supra)*, which announced for the first time an obligation to inquire.

In a footnote in *People v Lucarano (supra,* p 146, n 4), Judge Wachtler stated: "To the same effect, we held in *People v Smith* (54 NY2d 954) that knowledge that defendant had been arrested eight months previously gave rise to a duty to inquire whether defendant was represented (see, also, *People v Fuschino,* 59 NY2d 91)." Doubtless, one may argue that the above-quoted language promulgates the rule that once an investigating officer finds out about a prior arrest made within eight months of the date of present interrogation he must ask the suspect if that arrest led to formal charges and, if so, whether he is represented on the prior charge. But, other language used by Judge Wachtler in *People v Lucarano (supra)*, as well as a reading of the majority memorandum in *People v Smith (supra)* leads me to conclude that Judge Wachtler never intended that language be read as meaning that the Court of Appeals has adopted such a fixed, or per se rule for all cases. The memorandum in *People v Smith (supra,* p 956), reveals that the court was impressed by the fact that at the hearing the officer "testified that he assumed that defendant had an attorney on that charge". If he assumed that, he should have made an inquiry. Moreover, it would appear from the memorandum that the question of whether

the investigating officer was aware of an ongoing prosecution as opposed to simply a prior arrest was not necessarily passed upon by the court in that case. Even more importantly, in *People v Smith* (*supra*) the prior arrest was for a serious felony, which one could reasonably assume to be still pending eight months after the charge was filed since the People have six months to mark such a case ready for trial and one has to allow for reasonable adjournments which could extend the time (CPL 30.30, subd 1, par [a]).

On the other hand, in *People v Fuschino* (*supra*) one of the investigating officers was the same police officer who had arrested the defendant some 14 months earlier. There, the court held that the officers' "reasonable and well-founded belief that the 1978 charges against the defendant had been dismissed put them under no obligation to inquire" (*People v Fuschino, supra,* pp 98-99). Clearly, then, the knowledge of a prior arrest in and of itself cannot be said to automatically give rise to the obligation to make an inquiry as to any and all charges that a suspect might have pending against him. Assuming that knowledge of a prior arrest, without knowledge of formal charges following the arrest, triggers an obligation of inquiry (which is not altogether clear), the arrest must be "recent" and whether an arrest is "recent" will, of necessity, depend upon the facts of the case at hand.

Inasmuch as I am not satisfied that under the present state of the law the prior arrests in this case are to be classified, either as a matter of law or of fact, as "recent" arrests for purposes of the *Bartolomeo* rule, I am not prepared to vote for suppression of the confessions given by the defendant.

Justice O'Connor has also concluded that defendant's admission to the complainant's mother should not be suppressed. I fully agree with him and concur on that point for the reasons stated in his opinion.

MANGANO, J. P. (concurring in part and dissenting in part). I concur with so much of the majority opinion which affirms Criminal Term's denial of those branches of defendant's pretrial motion which seeks to suppress (1) an oral statement given by defendant to the police and (2) a statement by the defendant to the mother of the complain-

ant. Nevertheless, I am compelled to vote in favor of (1) reversing the judgment of conviction, (2) granting those branches of defendant's motion which seek to suppress a tape-recorded and a written confession given by defendant to the police, and (3) ordering a new trial.

It is undisputed that the interrogating police officer in the case at bar had actual knowledge that the suspect being questioned, i.e., the defendant, was arrested by members of the same police department on two unrelated misdemeanors of public lewdness which occurred on April 7, and May 14, 1980, approximately 6¾ and 5½ months prior to the instant interrogation of October 28, 1980.

In *People v Bartolomeo* (53 NY2d 225, 232), the Court of Appeals held that where the interrogating police officer has actual knowledge that the suspect being questioned was recently arrested by the same law enforcement agency on an unrelated charge, (1) the police have an obligation to make inquiry as to whether the defendant is represented by an attorney in connection with the unrelated charge and (2) in the absence of such an inquiry, the police are "chargeable with what such an inquiry would have disclosed". "[S]tatements obtained in consequence of the interrogation must be suppressed if in fact the suspect is represented by an attorney with respect to the unrelated charge even though the fact of such representation is unknown to the officer" (*People v Bartolomeo, supra,* p 229; *People v Lucarano,* 61 NY2d 138).

However, the determination in *People v Bartolomeo (supra)* applies only to custodial interrogations of defendants (*People v Bartolomeo, supra,* p 231; *People v Folnsbee,* 96 AD2d 623; *People v Torres,* 97 AD2d 802, 804; *People v Hauswirth,* 89 AD2d 357, affd 60 NY2d 904). Based on the facts adduced in the record, and the applicable principles of law, accurately summarized by Justice O'Connor, I agree both with Justice O'Connor and Justice Niehoff, who concurs with Justice O'Connor, that defendant was not in custody at the time he initially went to the police station and gave his oral confession. Accordingly, the holding of *People v Bartolomeo (supra)* cannot be utilized to suppress this oral confession.

Nevertheless, once the oral confession was concluded, it is clear, and the majority so concedes, that defendant was in custody, i.e., a reasonable person in defendant's position would believe that he would not, under any circumstances, have been permitted to leave the squad room.

It is at this juncture that the police were required to comply with the obligation set forth in *People v Bartolomeo* (*supra*) and their failure to do so requires suppression of the tape-recorded and written confessions of the defendant.

In holding to the contrary, Justice O'Connor is of the view that *People v Bartolomeo* (*supra*) does not apply to misdemeanors. In concurring with Justice O'Connor, Justice Niehoff concedes that the term "charge" used by the Court of Appeals in *People v Bartolomeo* (*supra, p 229*) encompasses misdemeanors, as well as felonies. Nevertheless, in his concurring opinion, he votes to affirm the judgment of conviction on the grounds that (1) the Court of Appeals has never defined with exactitude what a "recent arrest" is, (2) in the absence of any exact definition this court is free to and must define that phrase on an *ad hoc* basis, (3) the phrase "recent arrest" has a different meaning when applied to misdemeanors as opposed to felonies, and (4) the misdemeanor arrests in the case at bar should not be considered as recent.

I respectfully disagree with these arguments.

Although the Court of Appeals has never exactly defined what constitutes a recent arrest for the purposes of applying the holding in *People v Bartolomeo* (*supra*), some guidelines may be gleaned from that case and relevant cases decided subsequent thereto. In *People v Bartolomeo* (*supra*), where suppression of defendant's statements was granted, the interrogating officer knew that the suspect being questioned had been arrested for an unrelated felony by members of the same law enforcement agency nine days before. In *People v Smith* (54 NY2d 954, 955-956), the Court of Appeals held that actual knowledge of the interrogating officer "that defendant had been arrested *eight months* earlier on a sodomy charge by the same police department" (emphasis supplied) obligated the officer to make inquiry concerning the earlier unrelated charge. In contrast to these cases, the Court of Appeals held in *People*

*v Fuschino* (59 NY2d 91) that the interrogating officer who had personally arrested the defendant on charges of harassment (a violation) 14 months prior to the custodial questioning, was under no obligation to inquire as to the status of those charges since it was reasonable to assume (as indeed the officer did assume) that those charges had been disposed of after so lengthy a period.

Since the prior unrelated misdemeanor charges in the instant case were only 6¾ and 5½ months old, they were, from a time perspective, sufficiently recent, pursuant to *People v Smith (supra)*, to invoke the holding of *People v Bartolomeo (supra)*. Moreover, there is no language in any of these afore-mentioned cases which indicates that a particular time span which is concededly recent with respect to a prior felony arrest, suddenly becomes remote with respect to a prior misdemeanor arrest. Nor do I find any support for such a proposition in the holding of the Court of Appeals in *People v Servidio* (54 NY2d 951). In *People v Servidio (supra)*, the interrogating officer had no actual knowledge of the prior unrelated 2½-month-old misdemeanor arrest. Under those circumstances, the Court of Appeals held in *People v Servidio (supra)* that the interrogating officer had no duty to make any inquiry about any pending unrelated charges. Nor is the excerpt from *People v Servidio (supra)* quoted by Justice O'Connor relevant to the case at bar. A close examination of that excerpt reveals that the Court of Appeals was dealing therein with the issue of constructive knowledge on the part of the interrogating officer, and not actual knowledge.

Finally, I agree with Justice Niehoff that the defendant's tape-recorded and written confessions cannot be admitted on the ground that defendant's consistent course of conduct is a functional equivalent to the denials found in *People v Lucarano (supra)*.

Since two of defendant's three confessions to the police, i.e., the tape-recorded and typed confessions, must, in my view, be suppressed, I turn to the next question to be resolved, whether defendant's judgment of conviction must be reversed, or may it be affirmed on harmless error principles in view of the fact that his oral confession was properly admitted into evidence.

In resolving this issue, the Court of Appeals in *People v Schaeffer* (56 NY2d 448, 455-456) has set forth the following guidelines:

"Especially is this true when the flawed evidence, as here, is in the nature of a confession, since, as pragmatic practitioners long ago learned, confessions of crime, supremely self-condemnatory acts, are almost sure to weigh most heavily with fact finders (see *People v Ramos,* 40 NY2d 610, 618-619; McCormick, Evidence [2d ed], § 148, p 316; Richardson, Evidence [10th ed — Prince], § 556). Nevertheless, before constitutional error, even when it deals with confessions, may be found to be harmless, it is not necessary that the untainted evidence on which the verdict in the case must be supported demonstrate undisputable guilt. Rather, the reasonable doubt standard, extremely high though it is, still leaves room for judgmental determination of harmlessness (e.g., *People v Sanders,* 56 NY2d 51, 66-67). In cumulative statement cases this invites caution.

"Thus, reviewing courts should take into account the degree to which tainted statements are duplicative of untainted ones and, to the extent that they are not, the nature and extent of the differences. For, though the corroborative nature of an overlap between a statement whose admission is infected with error and one which is may not contribute to the weight a fact finder gives to one which was properly received, still the more they differ the greater the possibility that the additional matter supplied by the tainted one was a *sine qua non* of the production of the verdict.

"And, because consideration of whether an error is harmless requires an evaluation not only of the tainted matter, but of the strength of the case absent the taint, the court must focus on the reliability and persuasiveness of the untainted matter and its source. So, for instance, written statements may be 'looked at as more reliable than their more evanescent oral counterparts' (*People v Garofolo,* 46 NY2d 592, 602, *supra;* see *People v Prince,* 50 NY2d 883 [tainted statement taken by an Assistant District Attorney in his official capacity held not harmless though untainted one was of similar content]).

"In short, neither side of the evidentiary equation may be ignored; and in the end, the picture must be seen as a whole.

"The ultimate question, of course, must be whether the People, as the beneficiary of the error, have fully borne the burden of establishing harmlessness by the strict, though not unrealistic *Chapman-Crimmins* standard; fair trial requires no less (*Chapman v California,* 386 US 18, 24, *supra*)".

The case of *People v Garofolo* (46 NY2d 592) is particularly instructive to the facts at bar. In *People v Garofolo* (*supra*), defendant gave an oral confession to the police which was properly admitted into evidence. His subsequent written confession, which was "identical in all material respects" to the oral confession (*People v Garofolo, supra,* p 602), was admitted by the trial court but was suppressed by the Court of Appeals, due to the fact that it was obtained without the presence of counsel who had already entered the proceeding. In the Court of Appeals, the People argued (p 602) that "because the untainted oral confession was identical in all material respects with the written one, it was not error [for the trial court] to have failed to suppress the latter". The Court of Appeals rejected that argument stating (*People v Garofolo, supra,* p 602): "It is well-nigh impossible to avoid the conclusion that the written version was accorded greater weight by the jury than was the oral one (see *People v Donovan,* [13 NY2d 148], 153). As witness the rules relating to parol evidence and the Statute of Frauds, written documents, especially those signed by the parties to be charged, are commonly understood, even if sometimes undeservedly, to evince a degree of deliberation and authenticity not generally associated with oral proof of the same events (see, generally, 9 Wigmore, Evidence, § 2454). This is not a preference confined to the legal mind alone. Serious written materials, in book form or otherwise, ordinarily are looked at as more reliable than their more evanescent oral counterparts, which are so much more often subject to the vagaries of memory and narration. So, when coupled with a confirmatory writing, even an oral statement takes on added credibility. Thus, by reiterating and, hence, corroborating the

substance of the oral confession, the written statement may well have erased whatever doubts the jury entertained concerning the credibility of the witnesses upon whom the People had to rely to prove the contents of the unwritten one".

Viewed within the framework of these guidelines, the improper introduction into evidence of defendant's tape-recorded and written confessions to the police cannot be considered harmless error in the case at bar.

Accordingly, I dissent in part and vote to reverse the judgment of conviction, and order a new trial.

WEINSTEIN, J., concurs with O'CONNOR, J.; NIEHOFF, J., concurs in a separate opinion; MANGANO, J. P., concurs in part and dissents in part and votes to reverse the judgment appealed from, to grant those branches of defendant's motion which sought to suppress tape-recorded and written confessions given by defendant to the police, and to order a new trial, in an opinion in which BROWN, J., concurs.

Judgment of the Supreme Court, Suffolk County, rendered May 5, 1981, affirmed.