THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIE LEE JOHNSON, Appellant.

Fourth Department, January 31, 1983

APPEARANCES OF COUNSEL

*Edward J. Nowak, Public Defender (Brian Shiffrin of counsel), for appellant.*

*Donald O. Chesworth, Jr., District Attorney (Kenneth Fisher of counsel), for respondent.*

OPINION OF THE COURT

HANCOCK, JR., J. P.

Defendant was convicted after a jury trial of manslaughter, first degree, and criminal possession of a weapon, second degree, arising from the shooting death in Rochester of Rose Kinsey. On appeal he urges that the court erred in refusing to suppress oral statements made at the scene to two police officers before the giving of any *Miranda* warning, contending that they were the product of custo-

dial interrogation. He maintains also that an oral statement made at the Public Safety Building after he was advised of and waived his rights should have been excluded as "fruit" of the illegal interrogations, citing *People v Chapple* (38 NY2d 112). In addition, he contends that the circumstantial evidence was insufficient to support his conviction.

Before the police may subject a suspect to custodial interrogation, they must explain his *Miranda* rights (see *Rhode Island v Innis*, 446 US 291; *Miranda v Arizona*, 384 US 436; *People v Huffman*, 41 NY2d 29, 33). There is no doubt that the officers questioned defendant at the scene without giving *Miranda* warnings; at issue here is whether defendant was in custody when they did so. " '[C]ustody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived' " (*People v Rodney P.*, 21 NY2d 1, 9). To determine the nature of defendant's involvement with the police at the scene we must analyze the testimony at the *Huntley* hearing of two Rochester policemen: Rafferty, an officer assigned to a patrol unit, and Bishop, an investigator with the detective bureau. Defendant did not testify.

The events start with a report received at police headquarters concerning a possible shooting in an apartment at 5 Vetter Street. To investigate, Patrolman Rafferty drove to the scene and found the apartment locked. Upon inquiry Rafferty learned that defendant was the occupant. He located him in a nearby pool hall. Defendant was intoxicated. At this point Rafferty had heard nothing further except unconfirmed reports that there was a woman's body in the apartment. On request, defendant willingly accompanied Rafferty in his police car to the Vetter Street address to permit the police to get inside. When Rafferty and defendant had arrived and were still in the car, someone told Rafferty that the police had opened the apartment but gave no other information. Defendant asked: "[W]hat [is] going on?" and Rafferty replied: "We have an allegation that there is a dead woman in your apartment. Do you know anything about it?" Defendant at first said he knew nothing but then related that he had left his apartment at

7:00 A.M. the previous day and that when he returned at 1:00 P.M. he found a woman lying on the kitchen floor. He thought she was drunk and went into his bedroom where he slept for the afternoon. When he got up at 6:00 P.M., he said, she was still there and then he thought she was dead. Once again, he left the apartment. After first denying that he knew her, he recalled that her name was Rose and that she was a girlfriend of one "Cadillac". The session ended when Detective Bishop, who had seen the body in the apartment, approached the police car with another policeman. After informing Rafferty that there had been a homicide, these two officers "transferred" defendant to Bishop's car. This, according to Patrolman Rafferty, was the first time that he knew that there was in fact a body in the apartment and that a homicide had occurred. Until that moment, he said, he would have permitted defendant to leave.

Bishop testified that defendant willingly entered his car so that "he could talk to him". His purpose was "to find out if [defendant] knew what had happened up there and if he knew anybody that might have done it." At this point, although Bishop knew that defendant was the occupant of the apartment where a homicide had occurred, he did not concede that he then considered defendant to be a suspect. Detective Bishop stated that defendant was not free to leave the scene during his questioning but that he did not tell defendant this, and there is no evidence that defendant was aware of the fact. The information defendant gave in reply to Bishop's first question concerning what he had done the previous day differed in some respects from what he had told Rafferty. He stated that after drinking all morning, he went home at 1:00 P.M. and went to sleep. When he woke up about 1:00 the next morning, he went into the kitchen and saw a woman on the floor. She had not been there, he said, when he went to bed in the afternoon. He denied knowing her. After about 10 minutes in Bishop's car, defendant was taken to the Public Safety Building. There, after being advised of and waiving his rights, he told Officers Trotto and Dominick the same story he had given to Rafferty concerning his movements, the identity of the victim, and the time of discovery of the body. He

added further incriminating information: that he had the only key to the apartment; that he owned a handgun; and that he had occasionally gone drinking with the victim.

In determining when custody has attached, courts have considered such factors as whether the questioning was investigatory or accusatory in nature (see *People v Yukl,* 25 NY2d 585, cert den 400 US 851), whether it took place in a "'police-dominated' atmosphere" (*People v Huffman,* 41 NY2d 29, 34, *supra,* citing *People v Shivers,* 21 NY2d 118) (e.g., in the "threatening presence of several officers", *United States v Mendenhall,* 446 US 544, 554); and, to the extent that it was conveyed to the suspect, whether the officer knew that a crime had been committed (see *People v Paulin,* 25 NY2d 445) and whether he would have permitted the individual to leave (see *United States v Mendenhall, supra,* p 554, n 6). Even an interview of extended duration may be noncustodial (see *People v Yukl, supra,* p 589).

■ While he was with Patrolman Rafferty prior to Bishop's arrival, we have no difficulty in finding that defendant could not reasonably have believed that he was "'physically deprived of his freedom of action in any significant way'" (*People v Rodney P.,* 21 NY2d 1, 9, *supra*). Rafferty was the only police officer present. There is no suggestion of threats or intimidation or of physical restraint. Rafferty told defendant only that the police had an unconfirmed report of a dead woman in the apartment; and there was no reason for defendant to believe that Rafferty knew either that the report was true or that a crime had occurred. The apartment was locked. Certainly in such circumstances law enforcement authorities would be expected to investigate. That a guilty person may feel — as defendant may have here — threatened or restrained in the presence of police not because of objective police conduct but because of secret guilty knowledge does not render the situation custodial (see *People v Yukl, supra,* pp 591-592). Because they were not made during custodial interrogation, defendant's statements to Rafferty, we hold, were properly admitted at trial.

The circumstances after Detective Bishop and another officer arrived, and, in Rafferty's words, "took [defendant]

from [Rafferty's] car and put him in the detective car", present a closer question. There is more evidence that then the atmosphere became "'police dominated'" (*People v Huffman, supra,* p 34). The transfer was made by two officers. One, Bishop, was a detective. The first question Bishop asked was "what * * * [had defendant] done yesterday?", and from the transfer to the detective car and the nature of Bishop's inquiries, defendant must have known that Bishop then knew that Rose Kinsey had been shot to death. As with Rafferty, there is no suggestion of any coercive or threatening conduct by Bishop. Although he was not free to leave, it is significant that defendant did not know this (see *United States v Mendenhall,* 446 US 544, 554, n 6, *supra,* to the effect that the subjective intent of the officer to detain the suspect is irrelevant except insofar as it is conveyed to the suspect). Considering all of the hearing evidence, we find no reason to reject the court's conclusion that the questioning by Bishop was also not custodial (see *People v Rodney P.,* 21 NY2d 1, 9, *supra*).

Since we agree with the trial court's refusal to suppress statements made at the scene to both Rafferty and Bishop, it follows that the post-*Miranda* statement given at headquarters was properly admitted. Even if we were to hold that the situation had changed to custodial after Detective Bishop, who knew that a homicide had occurred in defendant's apartment, took over the questioning, there would be no reason to suppress the post-*Miranda* statement; for even then the statement at headquarters could not be said to have resulted, either directly or through a "single continuous chain of events" (*People v Chapple, supra,* p 114) from illegal police conduct. Rafferty's investigatory questions, put to defendant prior to learning of the homicide from Bishop, we have said were unquestionably noncustodial. The statement taken later at headquarters under formal interrogation contains more information than given previously but in the details relating to defendant's comings and goings, the time he discovered the body and his knowledge of the victim's identity it corresponds exactly with what he told Rafferty. In several of these details, on the other hand, the headquarters statement differs from the briefer account of his activities that defendant gave to

Bishop. Because, as a comparison of the various statements demonstrates, the post-*Miranda* statement was both a reiteration and an amplification of defendant's responses to Rafferty's questioning and flowed therefrom rather than from Bishop's questioning, there would, in any event, have been no reason to exclude it. Moreover, the statements made to Bishop added nothing to defendant's other admissions. For this reason, we find that " 'there is no reasonable possibility that [any] error [in the admission of defendant's statements to Bishop] might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt' " (*People v Rivera,* 57 NY2d 453, 456, quoting *People v Crimmins,* 36 NY2d 230, 237; see *People v Sanders,* 56 NY2d 51, 66-67; cf. *People v Schaeffer,* 56 NY2d 448).

■ The circumstantial evidence supporting the guilty verdict includes the following. The victim's body was found in defendant's apartment as were two spent shell casings. Defendant admitted to Officer Dominick that he owned a handgun and had shot it on many occasions. His own statement established that he had the only key to the apartment and that on the day of the murder he had left it locked at all times. The victim was last seen alive at about 4:00 P.M. on the day in question walking with defendant towards his apartment. At 6:00 P.M. a witness saw defendant coming out of his home alone. Five hours later police discovered the body. We find the evidence ample to sustain the conviction (see, generally, *People v Kennedy,* 47 NY2d 196; *People v Benzinger,* 36 NY2d 29).

We have reviewed the other points raised on appeal and find them to be without merit. The judgment should be affirmed.

DOERR, DENMAN, BOOMER and SCHNEPP, JJ., concur.

Judgment unanimously affirmed.