OPINION OF THE COURT
Charles J. Thomas, J.
Defendant is charged with murder in the second degree, arson in the second degree and other charges. Defendant moves to suppress certain statements allegedly made by him on the grounds that they were made in violation of his Miranda rights and that they were otherwise involuntarily obtained.
A pretrial Huntley hearing was commenced on October 22, 1996 and continued through November 1, 1996. At the hearing, Fire Marshal Eugene West testified on behalf of the People. Defendant presented no witnesses on his behalf.
Based upon the moving papers, the credible evidence adduced at the hearing and the posthearing memoranda submitted by counsel, the court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
A fire began in the early afternoon of Sunday, October 8, 1995, at 40-04 36th Avenue in Queens. While the fire was still *25 burning Fire Marshal Eugene West of the Special Investigation Unit of the Bureau of Fire Investigation, was notified to respond to the location of the fire. When he arrived he observed that the primary location of the fire was in the vicinity of apartments D4, D5, and D6. Fire Marshal West was informed by his supervisor, Fire Marshal Dennis Guardiano, that his preliminary assessment indicated the fire had originated in apartment D6, and he was then assigned the investigative responsibilities for the fire. Fire Marshal West also conducted his own investigation of the three apartments and independently determined the fire had begun in apartment D6. During the early stages of the investigation Fire Marshal Gopel interviewed Moisés Blandón, who had been identified as the resident of apartment D6.
The following day Fire Marshal West spoke to Mr. Blandón who claimed that he had not been home at the time of the fire and that the last time he had been in the apartment was between 3 o’clock and 4 o’clock on Saturday, October 7th. Mr. Blandón then agreed to do a "walk through” of the fire scene in his apartment.
At approximately 10:00 p.m. that evening Fire Marshal West spoke to Antonio Riojas, the brother of Marabel Riojas, Mr. Blandon’s recently estranged wife. Mr. Riojas informed Fire Marshal West that he was in possession of a key to the apartment and that he periodically went to the apartment in order to check for his sister’s mail; the last time being the evening before the fire. Fire Marshal West questioned Mr. Riojas about a bottle of Bacardi Rum on the kitchen counter which Mr. Riojas said he knew nothing about.
On October 12, Fire Marshal Jules Keitt interviewed Mr. Patel, the owner of Patel Liquors in Queens, who identified a photograph of Moisés Blandón as someone who had been a frequent customer until approximately six months ago, and that on October 7, he and another individual purchased liquor from the store.
On October 14, Fire Marshal West interviewed Marabel Riojas, and she agreed to cooperate in the investigation into the fire. On November 24th, Mr. West interviewed Ms. Riojas again at the Fire Department investigative offices on Hooper Street, Brooklyn, and informed her that they were trying to find out whether the fire had been accidental or intentional and she agreed to cooperate with them and that they could contact her husband through her.
Ms. Riojas set up a meeting with Mr. Blandoji on December 2, 1995. Prior to the meeting Ms. Riojas met with Fire Marshal *26 West who, with Ms. Riojas’s permission, wired her person with a recording device. Ms. Riojas met with Mr. Blandón at about 9 o’clock at the Crazy Chicken Restaurant on Roosevelt Avenue, in Queens for dinner. Approximately an hour and a half later Ms. Riojas returned to Fire Marshal West who was waiting in a surveillance van located two blocks away. While she was walking she noticed that Mr. Blandón was following her.
When Mr. Blandón approached the van Fire Marshal West, in an attempt to protect Ms. Riojas, informed Mr. Blandón that they had been looking for his wife and that it was their intention to take her to their office to interview her about the fire. Mr. Blandón insisted on accompanying her to their offices and Fire Marshal West reluctantly agreed provided that neither of them speak in Spanish while they are together.
When they arrived at the office at 10:35 p.m. Ms. Riojas was taken to the fifth floor where the recording device was removed and Mr. Blandón was told he could stay in the fourth floor conference room area.
Ms. Riojas was interviewed again from about 10:50 p.m. to 12:30 a.m. At 12:40 a.m. Fire Marshal West asked Mr. Blandón if he would consent to be interviewed and he agreed. During the interview Mr. Blandón provided a sketch of the apartment, and the location of furniture and personal possessions. The interview was very specific. Fire Marshal West questioned defendant in detail and a sketch was prepared by Fire Marshall Gopel, which was preserved and admitted into evidence as People’s exhibit 2. At 1:45 a.m. the interview stopped and Mr. Blandón was given a break. The interview resumed 20 minutes later and Mr. Blandón was asked to describe his actions at the time and shortly before the fire. Mr. Blandón told Fire Marshal West that he had been drinking heavily and he had spent the evening at a whorehouse and that he returned to his mother’s home. He later went out for a while and returned and remained there until 7:00 p.m. when the detectives appeared at his mother’s apartment informing them of the fire in his apartment. After Mr. Blandón made his statement Fire Marshal West asked him for further details and for explanations of the discrepancies in his story.
Shortly before 2:40 a.m. Mr. Blandón went to the bathroom and the interview continued five minutes later. Approximately 15 minutes later Mr. Blandón admitted to being in the apartment at the time of the fire and that he had become depressed over the loss of his family and began drinking from a bottle of Bacardi Rum. He said that he lit a cigarette and fell asleep only to be awakened to smoke coming from his mattress.
*27 At that point, Fire Marshal West interrupted the interview and advised Mr. Blandón of his Miranda rights from a preprinted sheet, which was preserved and admitted into evidence as People’s exhibit 3. Mr. Blandón indicated that he understood each of the rights as they were read to him. After being advised of his rights defendant agreed to make a statement.
Defendant then stated that there was a fire and flames two to three feet high and that he was drunk and scared and that he tried to put the fire out but couldn’t and so he left. At about 3:15 a.m. when they took another break, defendant asked for a chance to speak to his wife and he was permitted to do so.
At approximately 3:45 a.m. defendant continued his statement to Fire Marshal West who testified at the hearing as follows:
"He said he wanted to destroy his apartment, and I asked him what he meant by that, and I recall him saying to me he wanted to make everything disappear, and I said what did you mean by that, and he said all the things that I had left he wanted to make them disappear, and his quote to me I believe was all the things that I had left, and he meant his personal belongings in the apartment and the apartment itself since he associated that, at least he stated, with his wife and his children * * *
"[He stated that] — he lit a match and he threw it on the bedding on the lower bunk bed, and that bedding ignited and then he attempted — he said his mind cleared at that time, and that he tried to put out the fire by moving the bedding around but the fire just got bigger and bigger and he panicked and again ran from the apartment, and in a manner which he stated previously went to his mother’s house by subway.’’ (Hearing transcript, at 65, line 1.21 through 66, line 1.14.)
At this point, with evidence that the fire may have been intentional, defendant was again advised of his Miranda rights; and using the same preprinted Miranda sheet as before, defendant indicated his responses directly on the sheet by checking and signing his name at each question. Fire Marshal West then asked defendant if he would provide a written statement. He said he would, but that he could not write well and asked West to write it out and permit him and his wife to review it. Fire Marshal West wrote out defendant’s statement and defendant was given the statement to review. After Fire Marshal West made corrections requested by the defendant, Fire Marshal West, defendant and his wife Marabel Riojas signed it. The written statement was concluded at 5:15 a.m.
*28 At 9:00 a.m. defendant was asked and agreed to make a videotaped statement. Prior to conducting the videotaped interview, an Assistant District Attorney again advised defendant of his Miranda rights and defendant indicated that he understood his rights and wished to continue and make a videotaped statement.
CONCLUSIONS OF LAW
Defendant sets forth three grounds upon which he seeks to suppress defendant’s statements. First, that the statement was the result of a custodial interrogation by Fire Marshal West before defendant had been advised of his Miranda rights and that the nature of the questioning rendered the statements otherwise involuntary; second, that the use of trickery and deceit, by the Fire Marshals, denied defendant due process; and third, that the use of defendant’s wife as an agent, to obtain information from her husband, violates public policy and should therefore be suppressed.
Ab initio, the court must determine whether defendant was in custody at the time he made the statements. The immutable standard, established in People v Yukl (25 NY2d 585), is whether a reasonable person, innocent of any crime, would have believed he was in custody under the circumstances. '
Applying that standard to this case, the court notes that here, the defendant approached the Fire Marshals and asked that he be taken to their Hooper Street offices with them. Given the Fire Marshal’s reluctance, it was only because of defendant’s insistence that he was taken to the offices in the first place. Upon arriving defendant was told that the Marshals were going to interview his wife on the fifth floor and "that he was free to stay down on the fourth floor if he wanted”. (Transcript, at 39.) In fact, defendant was advised that he was free to leave. His movements were unrestricted and defendant had access to television, coffee, and the kitchen area. No attempt to question defendant was made until 12:40 a.m. That first interview, to which defendant clearly consented, consisted of defendant’s detailed description of the apartment and its contents was clearly investigatory rather than accusatory (People v Johnson, 91 AD2d 327, affd 61 NY2d 932). Defendant was given a 20-minute break and an opportunity to get some coffee. The interview continued for another 40 minutes and defendant then gave an essentially exculpatory statement reiterating his claim that he was not in the apartment at the time the fire started. Thereafter another break was given so *29 that defendant could use the bathroom. At no point did defendant ask to leave.
It was only after the interview continued and defendant acknowledged being present at the time of the fire and that he had been drinking and lit a cigarette in bed that the Fire Marshals had cause to believe the fire could have been criminal as opposed to accidental in nature and that Fire Marshal West had probable cause to place defendant in custody. It was precisely at that point that Miranda warnings were given. Defendant clearly understood his rights and knowingly, and intelligently and voluntarily waived his rights before making any further statements.
Applying that standard the court finds that the statements made up to the point where he said that he had been drinking, had lit a "cigarette and consuming most of the Bacardi * * * he woke up to see smoke coming out of his mattress”, were noncustodial. After that defendant was in custody and any questioning subject to Miranda.
The court also concludes, pursuant to the criteria set forth in People v Anderson (42 NY2d 35), that the custodial statements were not otherwise involuntarily made or coercive in any way. The length of defendant’s presence at the office was approximately 12 hours, only half of which defendant was actually in custody and the actual time of interrogation was significantly less. At no time was defendant denied "elemental needs”. Rather the Marshals made refreshments and coffee available to defendant several times. While defendant was detained, he was given free reign of the fourth floor area and prior to signing the written statement and making of the videotape defendant was permitted to see and consult with his wife.
Defendant’s claim that the Fire Marshals engaged in a level of a deceit and trickery, which vitiates the voluntariness of his statement is without merit. Defendant claims that the Fire Department personnel engaged in trickery and deceit by making it appear that defendant’s wife was somehow in trouble.
The deception, however, was not initiated by the Marshals, but by the defendant himself who insisted that he be taken to the Hooper Street offices. There was no evidence offered that could have made defendant believe that his wife was being charged. He was only told that she was to be interviewed, which in fact she was.
Additionally, there was no evidence that defendant’s wife told defendant anything, while they were in the offices, which *30 resulted in defendant’s decision to make any of the statements in question, nor did defendant elicit any testimony that his statements were the product of any duplicity on the part of Ms. Riojas. Defendant’s claim that the Marshals were presenting Marabel Riojas as a concerned loving wife to her husband is absurd, given the fact that they had been estranged before the fire.
The law is clear that the use of tricks and deception is acceptable police conduct. Deceit will only invalidate a confession where conduct is so fundamentally unfair as to deny defendant due process or that there is a substantial risk that an innocent person might incriminate himself. (See, People v Tarsia, 50 NY2d 1.) Such was not the case here.
Finally, defendant’s claim that the Marshals’ questioning of and the use of defendant’s estranged wife, in the investigation, is against public policy, is also without merit. There is clearly no such policy in existence. The only policy governing confidential spousal communication is that which grants a privilege which prohibits the use of such communications as evidence at trial. (CPLR 4502.)
In any event, defendant’s position that he relied upon the confidential spousal relationship in his conversations with Ms. Riojas on December 2nd and 3rd is not supported by the evidence. In fact, there was no evidence adduced at the hearing regarding any information which the Fire Marshals may have obtained from Marabel Riojas or that any such information resulted in inculpatory evidence against defendant.
For all the foregoing reasons defendant’s motion to suppress is denied.